**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Criminal Action No. 18-cr-00489-CMA-02

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2. RONNIE JACQUEZ,

      Defendant.

---

## ORDER REGARDING RESTITUTION

---

      This matter is before the Court after Defendant Ronnie Jacquez's Sentencing regarding the restitution recommended by the United States Probation Office and the Government. (Doc. ## 163, 163-1, 163-2, and 166.) Having heard the arguments of the parties at the Sentencing Hearing (Doc. # 166), and upon review of the briefs submitted regarding the restitution issue (Doc. ## 169, 170, and 171), for the reasons that follow, the Court orders restitution in the amount of $6,038.50 to be paid to the provider of compensation.

## I.      BACKGROUND

      On November 21, 2019, Defendant Ronnie Jacquez pleaded guilty to an Information charging a violation of 18 U.S.C. § 924(c)(1)(A)(i), possession of a firearm in furtherance of a crime of violence. (Doc. # 133 at 2, ¶ 1; Doc. # 132.) Specifically, Mr. Jacquez admitted that he "went to, and robbed, the American Jewelry and Pawn

["American Pawn"] in Pueblo," that, during the robbery, he was armed with a gun that was discharged, and that he "stole various pieces of jewelry and seven firearms, including the manager's personal firearm" (collectively, "stolen items"). (Doc. # 133 at 6, ¶ 15.) The United States Probation Office (Doc. # 163 at 18; Doc. # 163-1 at 2) and the Government (Doc. # 169 at 7) seek restitution in the amount of $6,038.50, to be paid to the insurance company that compensated American Pawn for the actual cost of the stolen items and $11,491.01 to American Pawn for the amount of lost profits that American Pawn would have earned if it sold the stolen items for the exact "resale value" of such items. *See* (Doc. # 163-2 at 2–6).

At Mr. Jacquez's Sentencing Hearing[1] on February 20, 2020, Mr. Jacquez objected to the sought restitution that covered lost profits. (Doc. # 170 at 1.) The Court ordered supplemental briefing on the issue of restitution and whether, under the circumstances of this case, the Court could order restitution for lost profits. (Doc. # 166.)

On March 5, 2020, the Government filed its brief (Doc. # 169) arguing that the stolen items (i.e., jewelry and firearms) are "fungible commodities," and as such, restitution in the amount of the "fair market value" of these stolen items should be ordered against Mr. Jacquez. (*Id.* at 4–5.) Thus, the Government posits that American Pawn's sworn declaration of loss and representations as to the resale value of the stolen items are sufficient evidence to show that the sum total of the resale value minus

---

[1] The Court sentenced Mr. Jacquez to 60 months imprisonment and 3 years of supervised release. (Doc. # 167.)

the actual cost of the stolen items reflects the amount of restitution the Court should

award to American Pawn as a result of Mr. Jacquez's criminal conduct. (*Id.* at 6–7.)

Mr. Jacquez contends that the nature of pawn shops renders the restitution

calculation difficult under these circumstances. (Doc. # 170 at 4–5, ¶¶ 7–9.) To this

point, he asserts that pawn shop sales include "significant negotiation" and that these

"items are often discounted from their original asking price[,]" and as a result, the resale

prices do not necessarily depict the value for which each item may have been sold. (*Id.*

at 5, ¶ 9.) He contends that the restitution sought by the Government *carte blanche*

accepts the resale value as the value for which each item would be sold, but that this

amount improperly depends on speculation and would amount to a windfall in favor of

American Pawn. (*Id.* at 5.)

## II.     LEGAL STANDARD

A district court may order criminal restitution only as permitted by federal statute.

*United States v. Ferdman*, 779 F.3d 1129, 1131 (10th Cir. 2015) (citations omitted). The

Mandatory Victim Restitution Act ("MVRA") applies to "any offense that is a crime of

violence[,]" 18 U.S.C. § 3663A(c)(1)(A)(i), and requires an order of restitution in the "full

amount of each victim's losses as determined by the court and without consideration of

the economic circumstances of the defendant." *Id.* § 3664(f)(1)(A). Although criminal

restitution "serves punitive purposes[,]" its "primary goal" is "remedial or compensatory."

*Paroline v. United States*, 134 S. Ct. 1710, 1726 (2014). "Thus, the principal aim of such

restitution is to ensure that crime victims, to the extent possible, are made whole for

their losses." *Ferdman*, 779 F.3d at 1132 (citing *United States v. James*, 564 F.3d 1237,

1246 (10th Cir. 2009)). Victims should be restored to the positions that they occupied before the crime, *id.* (citing *Hughey v. United States*, 495 U.S. 411, 416 (1990)); but restitution "must not unjustly enrich crime victims or provide them with a windfall." *Id.* Indeed, a court "may not order restitution in an amount that exceeds the actual loss caused by the defendant's conduct, which would amount to an illegal sentence constituting plain error." *Id.* (citing *James*, 564 F.3d at 1243).

The Government has the burden to demonstrate "the amount of loss sustained by the victim as a result of the offense[,]" and "[a]ny dispute as to the proper amount . . . of restitution shall be resolved by the court by a preponderance of the evidence." *Id.* (quoting 18 U.S.C. § 3664(e)). But "the restitution phase of criminal sentencings should [not] become a substitute for civil trials." *Ferdman*, 779 F.3d at 1133.

The MVRA "undoubtedly 'require[s] *some* precision when calculating restitution. Speculation and rough justice are not permitted.'" *Id.* (quoting *United States v. Anderson*, 741 F.3d 938, 954 (9th Cir. 2013)) (emphasis in original); *see also United States v. Serawop*, 505 F.3d 1112, 1123 (10th Cir. 2007) (explaining that restitution cannot be based on "sheer speculation and hypotheticals"). The "controlling metric for an award of restitution pursuant to the MVRA *in every case* is *actual loss suffered*; nothing more, nothing less." *Ferdman*, 779 F.3d at 1139 (emphasis in original). Still, a district court "may resolve restitution uncertainties with a view towards achieving fairness to the victim so long as it still makes a reasonable determination of appropriate restitution *rooted in a calculation of actual loss*" even if "exact" precision is unnecessary. *Id.* (quoting *United States v. Gallant*, 537 F.3d 1202, 1252 (10th Cir. 2008)) (citing

*United States v. Parker*, 553 F.3d 1309, 1323 (10th Cir. 2009)). However, the district court "must support '**every dollar**' of a restitution order with record evidence." *United States v. Matthew*, 916 F.3d 510, 516 (5th Cir. 2019) (emphasis added).

"Given § 3663A generally uses the term 'value' and does not require the use of the term "fair market value," the MVRA framework authorizes the district court "to determine in each circumstance the best measure of value for the purpose of calculating the actual loss in awarding restitution." *James*, 564 F.3d at 1246 (holding that district court did not err in using foreclosure sale amount rather than market value of property in determining actual loss for restitution award). The Tenth Circuit has observed that the "Supreme Court reminded us that in the case of fungible goods, "[t]he test of market value is at best but a convenient means of getting at the loss suffered. **It may be discarded and other more accurate means resorted to, if, for special reasons, it is not exact or otherwise not applicable**." *Ferdman*, 779 F.3d at 1138 n. 2 (quoting *Ill. Cent. R.R. Co. v. Crail*, 281 U.S. 57, 64–65 (1930)) (emphasis added). And "one logical way to assess the value of the lost property is by its cost to the victim—how much the victim paid for the lost property." *United States v. Wilfong*, 551 F.3d 1183, 1184 (10th Cir. 2008).

"Where the district court concludes the record contains insufficient information to permit at timely calculation of a victim's actual loss, the MVRA provides the court with three non-mutually exclusive options: (1) ask the Government to submit additional evidence, (2) hold an evidentiary hearing, or (3) decline to order restitution." *Ferdman*,

779 F.3d at 1133 (citing 18 U.S.C. §§ 3663A(c)(3)(B), 3664(d)(4), (d)(6)). However, "[i]ssuing an order of restitution unsupported by the evidence is not an option." *Id.*

### III.    ANALYSIS

The parties do not dispute that restitution for the value of the stolen items is warranted. What is disputed is what "value" to ascribe such items. The Government suggests that the "value" of the stolen items must include the amount that American Pawn would have earned had it sold the stolen items at their exact "resale" price, $11,491.01. (Doc. # 169 at 4–7); *see also* (Doc. # 163-2 at 2–6). Mr. Jacquez asserts that the amount American Pawn paid for the stolen goods, $6,038.50, "is the most precise way to make American Pawn whole without providing a windfall." (Doc. # 170 at 3.) The Court agrees.

As a preliminary matter, that the stolen items are fungible goods does not automatically require application of fair market or retail value for purposes of determining restitution. Indeed, the Tenth Circuit expressly rejected adopting a rule "that where retail goods are stolen, the proper measure of restitution necessarily is the undiscounted retail price of those goods." *Ferdman*, 779 F.3d at 1137. Still, the Government seeks to establish that this Court should focus on the "resale" value of the stolen items and relies on a series of non-Tenth Circuit cases in which appellate courts, some with little analysis, determine that district courts did not abuse their discretion in calculating restitution of stolen fungible goods by relying on fair market or retail value. (Doc. # 169 at 5–6.) Yet, American Pawn is not "exactly like the victims" in those cases because those victims are not in the business of selling fungible goods at pawn shops;

rather, those victims had established markets in which they could have sold their stolen fungible goods. *See United States v. Stamps*, 201 F. App'x 759, 762 (11th Cir. 2006) (concluding that district court did not commit plain error in using jewelry's retail value in calculating restitution where jewelry was stolen from retail jewelry shop); *United States v. Wright*, 176 F. App'x 373, 375 (4th Cir. 2006) (concluding that district court did not abuse discretion in awarding restitution in the amount of retail value of firearms stolen from retail sporting goods store); *United States v. Susel*, 429 F.3d 782, 784 (8th Cir. 2005) (concluding that district court did not err in calculating restitution of copyright loss based on retail value of stolen items that were actually sold); *United States v. Rice*, 38 F.3d 1536, 1544 (9th Cir. 1994) (determining that district court did not clearly err in awarding restitution in amount of "book value" of samples stolen from company that sells fasteners to aircraft manufacturers); *United States v. Lively*, 20 F.3d 193, 200–03 (6th Cir. 1994) (district court did not abuse discretion in using retail price for the merchandise stolen from mail order company that could have sold the mail-order items at the retail price level); *United States v. Robertson*, 493 F.3d 1322, 1332–33 (11th Cir. 2007) (concluding that district court did not abuse its discretion in ordering restitution in amount of wholesale market price of each unreturned unit of software where government showed that victim "would have received [the fair market price] in the ordinary course of business"). Because the Government (and the authority upon which it relies) fails to consider the contextual circumstances in which pawn shops sell fungible goods, the Court is unconvinced that it must automatically apply the "resale" value at

which American Pawn might have sold the stolen items. *See Ferdman*, 779 F.3d at

1138.

Furthermore, the Government has not met its *Ferdman* burden and shown by a

preponderance of the evidence that American Pawn is entitled to lost profits. When the

United States seeks restitution in the amount of lost sales or profits from stolen retail

goods, the United States must proffer proof of those lost sales and profits and cannot

rely solely on the retail value of the stolen items. *Ferdman*, 779 F.3d at 1137. Indeed,

the United States "must present more than a claim that but for a defendant's theft, the

victim may have made additional sales[,]" *id.* at 1139; the "Government must present at

least some evidence . . . from which the court could reasonable infer sales." *Id.* And in

calculating restitution, "courts are permitted to draw inferences from the totality of the

circumstances through an exercise of 'logical and probabilistic reasoning.'" *United*

*States v. Ahidley*, 486 F.3d 1184, 1189 (10th Cir. 2007). Moreover, when claiming

restitution under a theory of lost sales for a particular "fungible or readily replaceable

good like a cell phone," unless the United States "can show that the defendant's crime

depleted the stock of [such a good] . . . **at a time when the victim might otherwise**

**have been able to sell that good to a willing buyer, something akin to replacement**

**or wholesale cost clearly appears the more accurate measure of actual loss**."

*Ferdman*, 779 F.3d at 1140 (emphasis added).

In the instant case, the Government furnishes only American Pawn's sworn

declaration that it is entitled to $17,529.51 based on its attachment of "actual cost" and

"resale value" amounts corresponding to each stolen item.[2] (Doc. # 163-2 at 2–6.)
However, American Pawn's declaration does not address how American Pawn
expected to recover the "resale" value on each item, how the "resale" value was
calculated, whether American Pawn typically sells its items for the "resale" value, and
whether there were willing buyers for the stolen items. The face of the inventory report
depicts merely resale values assigned by PawnMaster software (Doc. # 163-2 at 3); but
there is no explanation, let alone information, tethering PawnMaster's assignment of
resale values to the Pueblo market of consumers willing to pay the resale value to
purchase items similar to the stolen items in the pawn shop context. Given that
negotiation and haggling are ubiquitous among pawn shop sales, without additional
evidence justifying that proposition, this Court is reluctant to infer that American Pawn
would have sold each stolen item for the exact resale amount it initially ascribed to each
item. *See Ahidley*, 486 F.3d at 1189. As such, the Court finds that the actual cost that
American Pawn paid to acquire the stolen items "appears [to be] the more accurate
measure of actual loss" in the instant case. *Ferdman*, 779 F.3d at 1140; *see also
Wilfong*, 551 F.3d at 1184.

Finally, that American Pawn's declaration was sworn does not restore this
Court's confidence that the Government has met its burden by a preponderance of the
evidence to show that American Pawn is entitled to lost profits. Indeed, *Ferdman*

---

[2] Although American Pawn represented that it has already been compensated $6,038.50 by an
insurance company (*id.* at 2) and, yet, seeks $17,529.51, the Government seeks only restitution
in the amount of $6,038.50 to the insurance company and $11,491.01 to American Pawn. (Doc.
# 169 at 7.)

demands more. In *Ferdman*, the government sought restitution for Sprint's expenses incurred in investigating the criminal fraud. 779 F.3d at 1134–35. The Tenth Circuit criticized the government's evidence in support of these expenses because the evidence included "*estimates* of Sprint's expenses supported by the unverified signature of a Sprint officer" and "[t]he record contain[ed] no actual proof, not even an affidavit, of what those expenses were." *Id.* at 1140 (emphasis in original). "That the expenses for the most part appear reasonable" and there is a "likelihood that certain facts exist to confirm" estimates, "no matter how probable, [do] not relieve the Government of its burden, after proper objection, to establish their actuality" and "satisfy the evidentiary dictates of the MVRA." *Id.* Although American Pawn submitted a sworn declaration of loss as to the restitution, the sworn declaration itself is a conclusory recital of "resale" values set by PawnMaster. (Doc. # 163-2.) Even if the declaration is sworn, the substance of the declaration must provide sufficient information upon which to determine that American Pawn would have sold the stolen items for their "resale" value. The absence of such evidence requires this Court to make improper assumptions and inferences that disregard the nature of negotiating prices in pawn shop sales to determine that American Pawn is entitled to lost profits as its "actual loss." That speculation is neither permitted nor a sufficient basis upon which this Court can award restitution. *See Ferdman*, 779 F.3d at 1133. Accordingly, the Government has not met its burden of demonstrating that the amount of loss sustained by American Pawn includes lost profits arising from the stolen items.

10

IV.      **CONCLUSION**

For the foregoing reasons, it is

ORDERED that Defendant Ronnie Jacques is to pay restitution in the total

amount of $6,038.50 to the insurance company who compensated American Pawn. It is

FURTHER ORDERED that the Probation Office is respectfully DIRECTED to

submit to the Court an amended Judgment  to reflect the restitution amount ordered

herein.

DATED:  May 5, 2020

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge